The principal questions in this case arise upon that portion of the charge by which the jury were *Page 371 
instructed that the postscript to the letter of Sisson Chapman to Cromwell, Haight Co. was libelous, per se, and that, if they found the statement in the postscript to be false, their verdict must be for the plaintiffs.
Among other points made by the counsel for the defendant, it is insisted: First. That the language of the postscript is equivocal; that it does not necessarily impute to the plaintiffs any want of ability to meet their paper, but may have meant merely that the note was held over for a short time as a matter of convenience to them; and that its interpretation in this respect was a question for the jury, and should have been submitted to them. Second. That the communication was privileged; and that the jury should have been instructed that the plaintiffs could not recover without proof of actual malice.
There is no doubt that where the language of an alleged libel is ambiguous, and capable of being understood in an innocent and harmless, as well as an injurious sense, its true interpretation is a question for the jury; but it is equally clear that if, upon an examination of the whole writing and comparison of its different parts, it appears to admit of no just construction except one which is injurious to the plaintiffs, its meaning is to be determined by the court. (Haire v. Wilson, 9 Barn. Cress., 643; Fisher v. Clement, 10 id., 472; Van Vechten
v. Hopkins, 5 John., 211.)
It is, perhaps, true, as claimed by the defendant's counsel, that the words "Had to hold over a few days for theaccommodation of L. H." are not necessarily to be taken in an injurious sense; that they might have meant merely that a little temporary indulgence had been granted to them as a matter of convenience and not of necessity. Had these, therefore, been the only words used, it might, perhaps, have belonged to the jury to say in what sense they were intended to be understood, although it can hardly be denied that, without some explanation of the circumstances *Page 372 
they would still have been calculated to cast a shade of suspicion upon the plaintiffs' responsibility.
If, however, these words had been used in the purely harmless sense here suggested, it is difficult to imagine any reason for their being preceded, as they were, by the word "confidential." This word gives character and point to the communication, and manifests a consciousness on the part of the writer that the fact communicated was one which the plaintiffs would not wish to have generally known. It seems impossible to resist the conclusion that the defendant, when he added the postscript in question, was aware that it might affect the credit of the plaintiffs. Admitting, then, that the words of the postscript would have been ambiguous and equivocal if used alone, I think they are not so when taken in connection with the word "confidential," which precedes them; and consequently, that the judge was right in assuming that they were to be understood in an injurious sense. It becomes necessary, therefore, to examine the question whether the communication, alleged to be libelous, was so far privileged as to throw upon the plaintiffs the burden of proving express malice.
Malice is essential to every action for libel. It has been sometimes divided into legal malice, or malice in law, and actual malice, or malice in fact. These terms might seem to imply that the two kinds of malice are different in their nature. The true distinction, however, is not in the malice itself, but simply in the evidence by which it is established. In all ordinary cases, if the charge or imputation complained of is injurious, and no justifiable motive for making it is apparent, malice is inferred from the falsity of the charge. The law, in such cases, does not impute malice not existing in fact, but presumes a malicious motive for making a charge which is both false and injurious when no other motive appears. Where, however, the circumstances show that the defendant may reasonably be supposed to have had a just and worthy motive for making the charge, then the law ceases *Page 373 
to infer malice from the mere falsity of the charge, and requires from the plaintiff other proof of its existence. It is actual malice in either case; the proof only is different.
The term "privileged," as applied to a communication alleged to be libelous, means simply that the circumstances under which it was made were such as to repel the legal inference of malice, and to throw upon the plaintiff the burden of offering some evidence of its existence beyond the mere falsity of the charge. It is no answer, therefore, to the position taken here, that the communication was privileged, to show that the jury would have been warranted in finding the existence of actual malice from the extrinsic evidence in the case. That question was not submitted to them. On the contrary, they were expressly instructed that the law would infer malice from the falsity of the words. If in this respect the charge was erroneous, there must, of necessity, be a new trial, without regard to the question whether express malice was proved.
The inquiry, then, is whether the circumstances in this case were such as to bring the communication within the class termed privileged. The limits of that class are not very clearly defined. The general rule, as stated by Mr. STARKIE, is, that "When a communication is made, in confidence, either by or to a person interested in the communication, supposing it to be true, or by way of admonition or advice, it seems to be a general rule that malice (i.e., express malice) is essential to the maintenance of the action." (1 Starkie on Slander, 321.)
If this rule is strictly accurate, then it is plain that the communication in this case was privileged; because it was made, in confidence, to persons directly interested in it, and apparently by way of advice. It is not entirely clear, however, but that the rule as here laid down may require some qualification. Where both parties, i.e., the party making as well as the party receiving, have an interest in the communication, it has never been doubted that it was privileged. *Page 374 
Where, however, the interest is confined solely to the party receiving, the authorities are not so decided. Mr. STARKIE appears to rest this portion of his rule mainly upon the case ofCleaver v. Sarraude, referred to by Lord ELLENBOROUGH, C.J., in McDougal v. Claridge (1 Camp., 267; 1 Stark. onSlander, 324). In that case a letter had been written confidentially to the Bishop of Durham, who employed the plaintiff as steward, to inform him of certain supposed malpractices by the plaintiff. As the defendant appears to have acted bona fide, the plaintiff was nonsuited, although it was not shown that the defendant had any interest in the matter.
This case, however, has not been regarded in England as settling the principle. In the cases of Coxhead v. Richards
(2 Mann., Gr. Scott, 569), and Bennett v. Deacon (id.,
628), the Court of Common Pleas was equally divided upon the question whether a stranger is justified in volunteering to give information, injurious to another, to one interested in the knowledge.
But, whatever may be the true doctrine on this subject, there is no doubt that where the communication is made bona fide, in answer to inquiries from one having an interest in the information sought, or where the relation between the parties by whom and to whom the communication is made is such as to render it reasonable and proper that the information should be given, it will be regarded as privileged. The precise question here is, whether such a relation existed in this case. In Todd v.Hawkins (8 Carr. Pa., 88), it was held that a letter written in good faith by the defendant to his mother-in-law, who was about to marry again, warning her of the bad character of her intended husband, was privileged; and a like decision was made in the case of Cockayne v. Hodgkisson (5 Carr. Pa., 543), where a tenant of a nobleman had written to inform him of his gamekeeper's neglect of duty. So, too, in this state, in the case of Washburn v. Cooke (3 Denio, 110), a communication made by an agent to his principal, in regard to the conduct of a third *Page 375 
person connected with the business of the agency, was held to be privileged.
These cases show that all that is necessary to entitle such communications to be regarded as privileged is, that the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others. Assuming, then, that the defendant made the communication in perfect good faith, as we must upon this question of privilege, is it to be regarded as an act of officiousness, on the part of a banker in the country, intrusted by a mercantile house in New-York with the collection of a note, to inform such house of the inability of the maker to meet the note at maturity? It would seem that if the relation of a son-in-law to his mother-in-law, of a tenant to his landlord, and of an ordinary agent to his principal, are sufficient, as in the cases just cited, to cause the information to be considered as privileged, that existing in this case must be equally so. It is a matter of the utmost interest to merchants in the city to be able to judge of the responsibility of their customers in the country; and even if they have no right to expect information on the subject from those whom they employ to collect their paper, yet the giving of such information by the person employed, where, as in this case, it relates to the very business with which he is intrusted, can scarcely be considered as officious, or more than an act of just reciprocity.
The communication, therefore, charged in this case as libelous, must be regarded as privileged. The defendant is nevertheless liable if there was any want of good faith in making it; but that question must be passed upon by the jury, and there must be a new trial for that purpose.